IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 7, 2004 Session

# RANDALL BILBREY, ET AL. v. GARY WORLEY, ET AL.

Appeal from the Chancery Court for Overton County
No. 44-598      Vernon Neal, Chancellor

No. M2003-01376-COA-R3-CV - **Filed November 1, 2004**

This is a landlord/tenant case involving abandonment and surrender by the tenant of the leased premises and whether or not the surrender was accepted by the landlord so as to prevent the landlord from collecting rents for the unexpired term of the lease. The chancellor first held for the landlord on the issue but thereafter came to believe himself bound by an unreported decision of this court and reversed his position to hold for Appellee. We find the first judgment of the chancellor to have been correct and reinstate his original judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Jon E. Jones, Cookeville, Tennessee, and Amy V. Hollars, Livingston, Tennessee, for the appellants, Randall Bilbrey, as Executor of the Estate of Agnes Bilbrey, deceased, and the Bilbrey Family Partnership and Randall Bilbrey as General Partner of the Bilbrey Family Limited Partnership.

Onnie Winebarger, Byrdstown, Tennessee, for the appellees, Gary Worley and Larry Worley.

## OPINION

This case involves a commercial lease wherein the tenant abandoned the premises long before the expiration of the extended term of the lease and the landlord sues for the recovery of accumulated rents subsequent to the abandonment.[1] On January 25, 2002, the chancellor filed

---

[1] Also included in the case below was an issue of "additional rent" based on a provision of the lease providing for payments of an overage fee to the landlord of 2% of all annual gross sales over $1,066,240. This issue was tried and judgment rendered thereon by the trial court. The "additional rent" issue was not appealed by either party and will not

(continued...)

comprehensive findings of fact and conclusions of law which we believe properly recite and dispose of the issues in this case and which provide in pertinent part:

1. This case involves a lease entered into on October 31, 1984, by and between The Cumberland Company and Gary Worley and Larry Worley, d/b/a Super-D Drugs. This lease superseded a prior lease between those same parties. The lease was in effect for a term of ten years beginning January 1, 1985, and ending December 31, 1994. The lease provided for a base rent of $21,324.80 a year or $1,777.07 a month, payable in advance. In addition, the lease contract contained a provision for "additional rent" which provided that the tenant pay an overage fee of two percent of all annual gross sales over $1,066,240. The lease provided that this overage payment be made "forthwith" following the end of each calendar year, based on the sales of the prior calendar year.

2. The original landlord became insolvent. In the summer of 1996, the plaintiffs acquired the shopping center from L.H. Hardaway, Jr., Trustee. Quenton and Agnes Bilbrey owned the property from August 13, 1996, through March 5, 1997, when Quenton Bilbrey died. His widow, Agnes Bilbrey, owned the property until she conveyed it to her son, Randall Bilbrey (a two percent undivided interest), and her grandsons, Stacey Bilbrey (a 49 percent undivided interest) and Tony Bilbrey (a 49 percent undivided interest), on July 30, 1998. Thereafter, these three individuals conveyed their interests on August 7, 1998, to the Bilbrey Family Limited Partnership, Randall Bilbrey, general partner. Agnes Bilbrey died on December 25, 1998. Randall Bilbrey is the executor of her estate.

3. The defendants vacated the property on or about April 30, 1997. At the time they vacated the property, the defendants had been "holding over" for two years, four months. The defendants did not make any overage payments for sales during 1994, or for any subsequent year.

4. The first issue for the Court to decide was whether the defendants breached the lease by vacating the property on or about April 30, 1997, and by failing to pay any rent thereafter. The defendants contend that there is a conflict between the "option to renew" clause and the "holding over" clause in the lease. The Court does not agree. The "option to renew" clause sets out certain procedures that the tenant can follow and, thereby, exercise an option to renew the lease for two additional five-year periods. To trigger the option, the tenant was required to give a 90-day notice. The defendants argue that there is no requirement that that notice be in writing. The Court disagrees. The lease itself defines the requirements for notice. Page eight of the lease states: "The mailing of notices. The mailing of a written notice or demand by registered or certified mail return receipt requested (in a sealed post-paid envelope) addressed to the landlord as follows: The Cumberland Company, c/o Imperial Management Company, P. O. Box 60464, Nashville, TN 37206." There

---

[1](...continued)
be further considered.

was no proof whatsoever in the record that the tenants gave any notice, written or otherwise, or any intent to exercise an option to renew the lease for an additional period. Certainly, the defendants did not give notice of any such intent as required by the terms of the contract.

5. Since the defendants failed to follow the provisions of the lease regarding giving notice of their intent to exercise an option to renew the lease for five years, they have no basis to assert that the lease's provisions regarding the effect of holding over should not apply to them. The hold-over clause of the lease states that if the tenant remains in possession of the property for more than 30 days following the expiration of the original term, the landlord can elect, at any time while the tenant is still occupying the property, to extend the lease for a second ten-year term. To effect the extension, the landlord must give a written notice of same to the tenant before the tenant surrenders occupancy. It was undisputed in this case that on November 25, 1996, the landlord delivered a letter to the tenants giving them notice of the landlord's election to extend the lease for a second ten-year term. This written notice was delivered to the tenants while they still occupied the premises. This written notice, therefore, effectively extended the lease contract for a second ten-year period, or from January 1, 1995, through December 31, 2004.

6. The plaintiffs are entitled to recover unpaid base rent for the second ten-year period of the lease, or through December, 2004. The plaintiffs have shown reasonable efforts to rent the property and to mitigate their damages. Their best efforts in this regard, however, were generally unsuccessful because of the rental market for commercial property in Livingston, Tennessee. After the defendants vacated the property, the plaintiffs initially stored material in the space. Therefore, for two months (May and June, 1997), the property was not available for lease, and the defendants cannot be charged with unpaid rent for those months. During the months of July,1998, through April, 1999, the property was rented to a local furniture manufacturer, and the defendants are entitled to mitigation for the amount of rent paid by this manufacturer. After giving the defendants full credit for the offsetting rent and for the two months in which material was stored in the property, the defendants remain indebted to the plaintiffs for monthly rental as follows:

Agnes Bilbrey Estate:
July, 1997, through June, 1998
(12 months @ $1,777.07=$21,324.84) ($4,904.71-interest)
July, 1998, @ $277.07 * =$277.07 ($57.49-interest)
These monthly amounts (after application of 6% prejudgment interest through October, 2001), total $26,564.11.

> Bilbrey Family Limited Partnership:
>> August, 1998, through April, 1999
>> (9 months @ $277.07 * =$2,493.63) ($430.15-interest)
>> May, 1999, through October, 2001
>> (30 months @ 1,777.07 = $53,312.10) ($3,998.41 interest)
>> These monthly amounts (after application of 6% prejudgment interest through October, 2001), total $60,234.29.
>> **

---

> \*      After mitigation.

> \*\*      After the hearing, the attorneys for the parties advised the Court that Mr. Randall Bilbrey had begun occupying the premises in November 2001, for the purposes of operating a business. The parties agreed that no damages would be owed to the plaintiffs for the period that Mr. Bilbrey's occupancy continues. The parties further agreed, and the Court rules, that the plaintiffs may file a new suit for loss of future rentals if the property becomes unoccupied at any time before the end of December, 2004, subject to any defenses the defendants may have at that time, including surrender and failure to mitigate.

In reversing himself on the issue of acceptance by the landlord of the surrender by the tenant the learned chancellor followed the holding of this court in the unreported case of *Maney v. Parker*, 1995 WL 577805 (Tenn.Ct.App. Oct. 3, 1995). In the *Maney* case, the parties entered into a five year lease whereby Parker leased from Maney a commercial building and, after occupying it for slightly more than a year, vacated the premises. The landlord then filed suit seeking among other things back rent. The chancellor denied recovery of back rent and Maney appealed.

This court held:

Our decision in this case turns upon whether Mr. Maney should be deemed to have accepted Mr. Parker's abandonment. Our Supreme Court addressed this issue in *Karns v. Vester Motor Co.*, 161 Tenn. 331, 30 S.W.2d 245 (1930). In *Karns*, the Supreme Court, in quoting from 35 Corpus Juris, 1093, adopted the following rule (161 Tenn. at page 333; 30 S.W.2d at page 245):

-4-

> The acceptance of a surrender is not implied from the mere fact of a reletting of the demised premises, although taken in connection with other circumstances the reletting may amount to an acceptance and work a surrender of the term by operation of law. Whether a reletting shows an acceptance of the surrender depends on whether the landlord relets on the account of the tenant or on his own account.

The Court, cognizant of the rule requiring mitigation of damages, also stated: "[T]he landlord may refuse to accept a surrender, and *after notice to the lessee of his intention to do so*, relet the premises for the best rent obtainable, and recover the difference between the rent reserved in the lease and the rent received from the subsequent tenant." (Emphasis added).

Thus it is quite clear that a landlord who relets abandoned property but wishes to avoid the doctrine of surrender by operation of law, must notify the tenant that the reletting is only in mitigation of damages and does not indicate an intent to accept the tenant's abandonment. The record in this case indicates that Mr. Maney left a message regarding the lease on Mr. Parker's answering machine approximately two months after receiving Mr. Parker's last rent payment. Mr. Parker testified that he attempted to return the call but got no answer. Mr. Maney made no further attempt to notify Mr. Parker of his intentions regarding the property even though they occasionally saw each other around town and Mr. Parker's address and telephone number remained the same.

We find that Mr. Maney's single attempt to telephone Mr. Parker regarding the lease is not sufficient to constitute notice of an intent to relet on Mr. Parker's account in mitigation of damages. Therefore, Mr. Maney's subsequent reletting of the property is an act inconsistent with the landlord and tenant relationship which evidences an intent to accept Mr. Parker's abandonment of the premises. Taken together, the acts of Mr. Parker and Mr. Maney constitute a surrender of the term by operation of law. Therefore, Mr. Parker was relieved of his obligations under the lease, not because of the alleged parol agreement to terminate, but because of Mr. Maney's acceptance of Mr. Parker's abandonment of the premises.

*Maney v. Parker*, 1995 WL 577805, ** 2-3 (Tenn.Ct.App. 1995).

While the trial court was justified in following the *Maney* case we disagree with *Maney* in its holding that the landlord must notify the tenant that the reletting is only in mitigation of damages and does not indicate an intent to accept the tenant's abandonment. This extension of certain of the language of the supreme court in *Karns v. Vester Motor Co.*, 161 Tenn. 331, 30 S.W.2d 245 (1930) has the effect of aligning Tennessee with the New York rule set forth in *Gray v. Kaufman Dairy and*

*Ice Cream Co.*, 162 N.Y. 388, 49 L.R.A. 580, 76 Am.St.Rep. 327, 56 N.E. 903 (1900).[2] This New York rule, which has found little support in other jurisdictions, states that when the landlord takes possession of the premises after abandonment by the tenant he must notify the tenant that the property is being re-rented at the risk of the tenant and that failure to give the tenant such notice absolves the tenant of any responsibility for unpaid rent accruing under the lease. Rules governing this particular feature of the landlord-tenant relationship are of ancient origin and the development of such rules is exhaustively annotated in *Higgins v. Street*, 13 L.R.A. (N.S.) 398 (1907).

The majority rule is refuted by the United States Court of Appeals for the District of Columbia:

> There are some authorities to the effect that a re-entry and reletting of abandoned premises by the landlord without the consent of the tenant would create a surrender, by operation of law. * * * The best approved cases, however, assert the contrary doctrine, and hold that, where a tenant repudiates the lease and abandons the demised premises, and the lessor enters and relets the property, such re-renting does not relieve the tenant from the payment of the rent under the covenants of the lease. *Oldewurtel v. Wiesenfeld*, 97 Md. 165, 176, 54 A. 969, 970.

> But the landlord, by taking possession, repairing, and advertising the house to let cannot be regarded as accepting the surrender of the tenant's terms. Such acts are equally as referable to the interest and benefit of the tenant, and do not discharge him from his covenant to pay rent. Wood, Landlord & Tenant, vol. 2, p. 1171.

> The quitting of the premises occupied by a tenant during the term, and sending the key to the landlord, who proceeds to repair and use the house, does not discharge the tenant from his liability to pay rent, unless the landlord consents to acquit the rent. *Livermore v. Eddy*, 33 Mo. 547.

*Basken v. Thomas*, 12 F.2d 845, 846 (Ct.App.D.C. 1926).

In addressing this question, the Court of Appeals of Maryland, in *Oldewurtel*, held:

> The general rule is well settled that, to constitute a valid surrender of rented premises by a tenant during the term, there must be the assent of both parties to the rescinding of the contract of renting, and such assent may be expressed or implied from such acts as would reasonably indicate that the parties have agreed that the tenant shall

_____

[2] But *see Charleston, S.C. Mining & Mfg. Co. v. American Chemical Co., et al.*, 126 Tenn. 18, 150 S.W. 1143 (1911) citing *Gray* for the general rule that a surrender by operation of law requires "some act so inconsistent" with the landlord-tenant relation as to imply their agreement to a surrender. In this 1911 supreme court case involving a mineral lease, a subsequent purchaser of the leasehold delayed in paying rent and exercising his mineral rights. When he later tried to pay the royalty to the landlord's successor, the owner of the lease remainder refused the royalty. The supreme court considered these actions in concert to operate as a surrender.

abandon the premises, and the landlord assume its possession. *Biggs v. Stueler*, 93 Md.110, 48 Atl. 727. The appellant admits that the defendant returned the key before the expiration of the lease. It was not accepted, and therefore up to this time no surrender took place. It is further conceded that the plaintiff had a right to enter for the purpose of taking care of the property, of repairing the premises, and to put a "for rent sign" in the window. But it is earnestly urged that the re-renting of the property for the benefit of the tenant without his assent was an acceptance of a surrender, an ouster of the tenant, and released him from liability for rent under the lease. There are some authorities to the effect that a re-entry and reletting of abandoned premises by the landlord without the consent of the tenant would create a surrender by operation of law. *Underhill v. Collins*, 132 N.Y. 271, 30 N.E. 576; *Gray v. Kaufman*, 162 N.Y. 388, 56 N.E. 903, 49 L.R.A. 580, 76 Am.St.Rep. 327; *Day v. Watson*, 8 Mich. 535; *Rice v. Dudley*, 65 Ala. 68. The best approved cases, however, assert the contrary doctrine, and hold that, where a tenant repudiates the lease, and abandons the demised premises, and the lessor enters and relets the property, such re-renting does not relieve the tenant from the payment of the rent under the covenants of the lease. *Auer v. Penn*, 99 Pa. 370, 44 Am.Rep. 114; *Meyer v. Smith*, 33 Ark. 627; *Bloomer v. Merrill*, 1 Daly, 385; *Scott v. Beecher*, 91 Mich. 590, 52 N.W. 20; *Rich v. Doyenn*, 85 Hum, 510, 33 N.Y. Supp. 341; *Alsup v. Banks*, 68 Miss. 664, 9 South. 895, 13 L.R.A. 598, 24 Am.St.Rep. 294. In *Biggs v. Stueler*, 93 Md. 111, 48 Atl. 727, this court said the acts upon which the appellee in this case relies to prove a surrender are the acceptance of the keys by the appellee, the repairs to the house, and the reletting. But those are insufficient of themselves to show acceptance, unless, under all the circumstances, they are of such a character as to show a purpose on the part of the tenant to vacate and on the part of the landlord to resume possession, to the exclusion of the tenant.

*Oldewurtel v. Weisenfeld*, 54 A. 969, 970-971 (Ct.App.Md. 1903).

In discussing this question in the context of a collateral rule relative to a reletting beyond the term of the original lease, the Court of Appeals of Maryland, drew the sharp contrast between the New York rule and the contrary rule prevailing elsewhere.

The New York rule was summarized in *In re Kerr*, 29 F.Supp. 414 (S.D.N.Y. 1939) in which a surrender was held to have been accepted where the landlord relet for two years beyond the term of the original lease which authorized reletting " 'for the whole or any part of the term from time to time as (landlord) may deem best.' " *Id*. at 415. The court said:

> The courts of New York hold that in the absence of an express provision in the lease authorizing the landlord to relet the making of a new lease is an acceptance of surrender of a then existing lease. *Gray v. Kaufman Dairy Co.*, 162 N.Y. 388, 56 N.E. 903 . . . .

However, in the case at bar the landlord entered into a lease extending beyond the term of the bankrupts' lease. In making such a lease the New York courts say that the landlord will be presumed to be acting for his own account and to have recognized a surrender of the premises in the absence of consent to such reletting. *Brill v. Friedhoff*, 192 App. Div. 802, 183 N.Y.S. 463 (1920); *Matter of Adams's Estate*, 149 Misc. 289, 267 N.Y.S. 910; *Matter of Goldburg's Estate*, 148 Misc. 607, 266 N.Y.S. 106; *Bonsignore v. Koondel*, 134 Misc. 344, 235 N.Y.S. 453. (*Id.* at 415-16).

The 1900 decision in *Gray v. Kaufman Dairy Co., supra*, was that an acceptance of surrender occurs by reletting without the consent of the tenant, and that consent cannot be inferred from mere silence. Consent may, however, be given in the lease. Thus New York decisions frequently turn on a search for consent to the length of the reletting in the terms of the original lease. Since this Court declined in *Oldewurtel v. Weisenfeld, supra*, 97 Md. at 176, 54 A. at 970, to adopt the rule of *Gray v. Kaufman* we do not find the rationale of the New York decisions to be persuasive.

Restatement (Second) of Property § 12.1, Comment I at 391 (1977) has adopted an unequivocal position:

A reletting may be for the benefit of the tenant even though it is for a term shorter *or longer* than the term in the original lease, and even though it is for a rent lesser or greater than the rent reserved in the original lease. Furthermore, the reletting may be for the benefit of the tenant even though various other terms of the original lease are not carried over in the lease to the new tenant. (Emphasis added).

*Millison v. Clarke*, 413 A.2d 198, 204-205 (Ct.App.Md. 1980) (footnotes omitted).

In applying Tennessee law District Judge Irving R. Kaufman ventured an opinion as to what Tennessee would do on reletting after surrender and the effect on the rule of Tennessee's requirement that the lessor must mitigate his damages.

Defendant first contends that by operation of law there was a surrender and acceptance of the property by virtue of the subsequent re-letting of the premises to a third party for a period beyond the expiration date of the initial lease. The lease in question permitted the landlord to re-let, but it is alleged did not authorize re-letting beyond the term of the first lease.

The New York rule appears to be that in making a lease for a term which exceeds that of the first lease, the landlord will be presumed to be acting on his own account and to have recognized a surrender of the premises in the absence of consent

to such re-letting. *In re Kerr, D.C.S.D.N.Y.* 29 F.Supp. 414 (1939), although some New York courts have expressed dissatisfaction with 'so hard and fast a formula' for determining the intent of the landlord. *Dasanat Realty Corporation v. Murray*, 138 Mis. 492, 246 N.Y.S. 693, 696 (1930). In the instant case the lease was negotiated in Tennessee and concerns Tennessee realty and it is clear therefore that the Tennessee law of surrender and acceptance governs. Unfortunately, it is not settled how the courts of that jurisdiction would deal with the present case. The only Tennessee authority on the effect of re-letting to which I have been referred is *Karns v. Vester Motor Co.*, 161 Tenn. 331, 30 S.W.2d 245 (1930). That case did not deal directly with the problem of a re-letting beyond the term of the first lease but applied the general rule that the resolution to the question whether a re-letting of the leased premises after the abandonment thereof by the tenant constitutes an acceptance of the surrender, depends on the intention of the parties as gathered from all the circumstances. I am inclined to the view that the Tennessee courts would not hold re-letting for a term beyond that fixed in the original lease conclusive as to intent as a matter of law, D.A. *Schulte, Inc. v. Haas*, 224 Mo.App. 365, 287 S.W. 816 (1926), but rather would submit for determination by the trier of facts the question whether the landlord's actual intent was to accept surrender.

This conviction is bolstered by an examination of the rationale of *Karns v. Vester Motor Co., supra*. There the court said, at 30 S.W.2d 245, 246:

"We do not hesitate, therefore, to adopt the broad and just rule stated above, which conforms to a general rule approved by this court, requiring the injured party to a contract to do everything possible to minimize his damages."

*C.H. Little & Co. v. Gay Apparel Corp.*, 108 F.Supp. 762 (S.D.N.Y. Dec. 22, 1952).

The lease in the case at bar contains a provision relative to default wherein it provides:

As used in this lease, the term "event of default" shall mean any of the following, (a) Tenant's failure to make payment of any rental installment or any other amounts payable by Tenant to Landlord hereunder within ten (10) days after same is due and payable; . . . Upon the happening of an "event of default" landlord at its option, may (a) terminate this lease; . . . or ©) terminate Tenant's right of possession of the lease premises without terminating the term of the lease. . . Upon termination of the Tenant's right of possession as provided above, Tenant shall promptly surrender possession to Landlord and vacate the leased premises. If Landlord elects to terminate Tenant's right of possession without terminating the terms of this lease, Landlord may, at its option, lease or sublet all or any part of the Leased Premises on such terms and conditions as Landlord may elect and collect from Tenant any balance remaining on the rent or other obligations payable by Tenant under this Lease.

The litany of contingencies set forth in *Karns v. Vester Motor Co.*, 80 S.W.2d 245 (Tenn. 1930)(quoting from 35 Corpus Juris at 1093) is disjunctive not conjunctive. Thus, the lead contingency "stands alone" in providing "there is no acceptance of the surrender where the reletting is pursuant to the provision of the lease authorizing the reletting on the lessee's account." 30 S.W.2d 245 at 245-246.

The intention of the parties as to the future of the lease after expiration of the initial term is evidenced by the provision for holding over and the written communications between the parties. The provision for holding over by the tenant after reciting that possession after the expiration of the lease would make the tenant a tenant-at-will provides: "However, this lease shall be deemed to have been extended for an additional period equal to the immediately preceding term or period of this Lease, if (at any time after thirty (30) days from the termination of this lease, but before Tenant vacates the Leased Premises) Landlord notifies Tenant of its election that the holding over shall result in such an extension."

On November 20, 1996, Worley notified Bilbrey in writing: "We are using this letter to give you notice that we will soon be vacating the building here. We feel we have an opportunity now to lower our overhead that may not be there in the future. We will vacate the building on or before February 20, 1997."

On November 25, 1996, Bilbrey notified Worley by letter: "I received your letter of November 20. Please refer to your lease, page 7, which as the paragraph regarding holding over. This letter is notice of the landlord's election that the holding over be deemed to have extended the lease for an additional period of ten years from the date of the expiration of the original term on December 31, 1994."

The facts of this case demonstrate the harsh realities that are sometimes compelled by the clear and unambiguous terms of written contracts. For several years these parties were co-tenants in a shopping center owned by The Cumberland Company and both Bilbrey and Worley commiserated with each other because they were laboring under an "additional rent" provision in each of their leases which required them to pay to the landlord an overage fee of 2% of all annual gross sales over a designated dollar figure. Bilbrey discussed with Worley the possibility that he might build a new shopping center or in the alternative might seek to purchase the existing shopping center from L.H. Hardaway, Jr., Trustee who was successor in interest to The Cumberland Company. The original ten year lease contract between The Cumberland Company and Worley expired on December 31, 1994 and Worley simply held over paying rent on a month to month basis. In the Summer of 1996, Bilbrey purchased the shopping center from L.H. Hardaway, Jr., Trustee and thereafter took a very different view about the overage fee and the "additional rent" generated thereby as to the Worley premises.

The situation of the parties after the Bilbrey purchase from Hardaway is best expressed by Larry Worley in his testimony:

Q. Did you just really want to move? Is that what the problem was?

A. No. We wanted to stay there. And would have, if we could have gotten a new lease. But this two percent overage had become too much.

Q. Did you have discussions with Mr. Bilbrey about the overage?

A. Yes, we did. We knew that he was wanting to get out of the same position, the same overage. Because he had talked numerous times about getting out of the [shopping] center himself, or moving and building a new one.

. . . .

Q. BY MR. WINEBARGER: How did you know that? Did he tell you this?

A. Yes. He told us the overage was killing him, just like it was us. And he was getting out of it one way or the other. He was either - - he had property down on West Main Street. If he couldn't buy the shopping center, he was going to move down there. He told us that several times. . . .

. . . .

Q. BY MR. WINEBARGER: Okay. After Mr. Bilbrey or his companies purchased the property, did you have a conversation with him about renegotiating the lease?

A. After he bought the shopping center?

Q. Right, after he purchased it?

A. I had one conversation in our store for about twenty minutes one day.

Q. Okay. And what did he say about renegotiating the lease?

A. Well, I spent about twenty minutes explaining to him the way our situation had changed since the early nineties, with the insurance companies, and the pharmacy benefit managers, with their dictating our reimbursement. So, but he became so angry over the, over us wanting to drop the percentage part of it. He became angry, and he wouldn't even talk about it.

. . . .

Q. BY MR. WINEBARGER: As a result of his response to this conversation, what did you and your brother do?

A. Well, my brother had, Gary had already talked to him. My dad had talked to him about the same situation, which I didn't know about then.

THE COURT: Well, I don't know if you can talk - - you can't testify as to what your dad said.

A. Well, okay. But I saw then that he was only interested in forcing us to sign the old original lease with the three thousand - - I mean, the 3.5 dollars per square foot per year, plus the overage which amounted to two percent. And our

-11-

situation was that we could no longer sign that kind of a lease anywhere. So he became so angry about it and would not talk about it. So I saw then that we could not talk to him anymore. That is when we made the decision to vacate. And so I sent him a letter, a certified letter saying we would be vacating the premises. And it was after that that he sends back a letter to us trying to hold us to this provision on the lease that had done been, done died. Done a dead lease.

The difficulty with the Worley position is that the lease was not "done a dead lease" but was in fact alive and well under the "hold over" provisions of the lease. The Worleys knew at the time of the heated discussions with Bilbrey before they made their decision to vacate the premises that Bilbrey was insisting on the continued viability of the 2% overage provision of the lease. At that time, the Worleys were also aware of the provisions of the "holding over by tenant" paragraph of the original lease. The key provision was "however, this lease shall be deemed to have been extended for an additional period equal to the immediately preceding term or period of this lease, if (at any time after thirty (30) days from the termination of this lease, but before tenant vacates the leased premises) landlord notifies tenant of its election that the holding over shall result in such an extension. The "preceding term" of the lease was ten years. The Worleys were still in possession of the premises when they elected to send to Bilbrey their letter of November 20, 1996 informing Bilbrey of their intention to vacate the building on or before February 20, 1997. Bilbrey promptly responded with his letter of November 25, 1996 electing to extend that lease for the additional ten year period under the "holding over by tenant" lease provision.

This business decision by Bilbrey was clearly consistent with his rights under the hold over provisions of the lease, and the only way to avoid the effect of that provision would be for the Worleys to have vacated the premises before Bilbrey had the opportunity to exercise his election. Practical considerations in the closing of a retail pharmacy business without the means of immediately continuing to service customers would militate against such an option.

The provisions of the lease agreement in *Maney* are not disclosed by the opinion of the court, and we cannot determine whether or not that lease contained a provision similar to the lease at bar relative to the reletting of the premises by the landlord upon abandonment thereof by the tenant. The default provision in the lease at bar gives the landlord the right to elect whether to terminate the lease or to terminate the tenant's right of possession upon abandonment of the premises by the lessee. The provision states:

> If Landlord elects to terminate Tenant's right of possession without terminating the terms of this lease, Landlord may, at its option, lease or sub-let all or any part of the Leased Premises on such terms and conditions as Landlord may elect and collect from Tenant any balance remaining on the rent or other obligations payable by Tenant under this Lease.

The lease provision does not require the landlord to give notice to the tenant as to which course he is electing to pursue. Such notice is not necessary except in cases following the New York

-12-

rule, and the inquiry, just as is stated in *Karns*, depends on a factual determination of whether the landlord has relet the property on his own account or on account of the tenant.

As one jurisdiction put it:

> The jury found the tenant surrendered with the consent of the landlord because the landlord did not consult the tenant with respect to reletting, did not notify the tenant of the terms of the relettings, and did not notify the tenant what he would be expected to pay, or that he would be held for the difference. A tenant may not, by abandoning the premises and ceasing to pay rent, relieve himself of obligation to pay rent. He cannot reap an advantage from his own breach of the contract. If he desires to surrender, he must secure the landlord's consent, and, if he alleges surrender, he must establish unequivocal manifestation of consent on the part of the landlord to termination of the relation of landlord and tenant. When a tenant abandons leased premises and ceases to pay rent, a landlord is not privileged to collect stipulated rent in full if he can make the premises earn something by relettng them. The tenant does not need to be told what his obligation is. He knows it is to pay rent to the end of the term, according to the covenant of the lease. Therefore reletting does not establish release of obligation to pay rent, and notice of reletting is not necessary to prevent surrender. All this has been said before, in the opinions in the cases of *Brown v. Cairns*, 63 Kan. 584, 66 P. 639, and *Hoke v. Williamson*, 98 Kan. 580, 158 P. 1115.

*Guy v. Gould, et al.*, 266 P. 925, at 925 (Kan. 1928).

The Supreme Court of Wisconsin addressed this question of election by the lessor.

> Under the rule of *Lincoln Fireproof Warehouse Co. v. Greusel*, (Wis.) 227 N.W. 6, 7, where a tenant vacates or abandons the leased premises before the end of the term, the landlord has a right to elect to accept the surrender and terminate the lease or to enter and take possession for the purpose of mitigating the damages for which the tenant is liable because of his breach of the lease. The election to enter for the purpose of mitigating damages may be evidenced by formal notice or by other proper means constituting such unequivocal act as would amount to an election of remedies in a proper case.
>
> The mere entry and taking possession of the premises for the purpose of leasing the same does not constitute such an election, because it is an equivocal act--something to be done by the landlord regardless of whether his purpose be to terminate the lease or merely to perform his legal duty to mitigate damages.
>
> The right to elect which course he will pursue remains with the landlord until he makes his election by taking some step which clearly evidences an intent to make a choice between the two inconsistent remedies that are open to him. Such a choice was made in this case when the plaintiff began this action. That act clearly evidenced an election on the part of the landlord to hold the tenant liable on the covenants of the

lease, and established the fact that the landlord took possession for the purpose of reletting the premises in order to mitigate the damages which he sustained through the tenants' breach of the lease. The lease expressly gave the lessor the option, upon the lessees abandoning or vacating the premises before the expiration of the term, to relet the same and apply the rents reserved from such reletting upon the lessees' obligation for rents due or to accrue. Consequently, the lessor's retention of the key, the placing of "For Rent" signs, and the reletting, were merely in exercise of the option which the lessees gave the lessor. At best, those acts might be considered of merely an equivocal nature, capable of being construed as indicating either an intention on the part of the landlord to relet for the benefit of the lessees, in order to mitigate the damages for which the lessees are liable because of their breach of the lease, or as indicating an intention to permit the lessees to surrender the premises and terminate the lease. As stated in Thompson on Real Property, § 1470:

"Too much importance should not be attached to a delivery of the keys to the landlord and his attempt to re-let the premises. The legal effect of these acts depends largely on the intent with which the keys were delivered and for what purpose they were accepted."

*Weinsklar Realty Co. v. Dooley, et al.*, 228 N.W. 515, 517 (Wis. 1930).

The Supreme Court of Pennsylvania addressed the same question holding that:

The burden of showing such acceptance is on the lessee (*Auer v. Penn, supra*; *see, also*, 35 C.J. 1094), and is primarily a question of the landlord's intention. It is usually a question of fact for the jury (*Breuckmann v. Twibill*, 89 Pa. 58), but the evidence may be such as to make it one of the law for the courts.

The lessees contend there is a surrender through the lessors' neglect to protest or to notify them that they would not accept the abandonment. The court below instructed the jury such notice was necessary. This is not the law. The result of such instruction is to make every quitting or abandonment of the premises effective as a surrender, unless such notice is given. The landlord is not required to protest against an abandonment of the demised premises. *In re Mullings Clothing Co.*, (C.C.A.) 238 F. 58, L.R.A. 1918A, 539.

Lessees now claim that an acceptance appears from the fact that notice was not given that the reletting was for lessees' benefit. The lessors' right to claim for rent after abandonment does not depend on either notice. The legal relations existing between the parties have not been changed by the absence of notice, and, in the reletting, where the new leases are within the terms of the original lease (*Rafferty v. Klein*, 256 Pa. 481, 100 A. 945), lessor's right is not lost.

The contract of lease created an estate in the lessee, and covenants between the lessor and lessee. The privity of estate, which is part of the completed legal relation of landlord and tenant, is divested when the lessee quits the premises. If the landlord refuses to accept the surrender offered, the privity established by the contract

is not terminated. The liability to pay rent is based on the covenants therein. The landlord, under his common-law right, for the protection of the demised premises, has a legal right to enter. On this theory he could permit the premises to remain idle and recover for the balance of the entire term. 16 R.C.L. 969, § 431. Reletting is not imposed on a landlord as a duty (*Auer v. Penn, supra*); and he cannot be held liable for failure to rent where a tenant is offered (*Lipper v. Bouve, Crawford & Co., supra*). Nevertheless, a landlord should be reasonably diligent in securing a desirable tenant for the best rent obtainable to minimize the first lessee's loss. *In re Mullings Clothing Co., supra.* Reletting does not invade the covenants by which lessee was bound, unless it exceeds or is so inconsistent with them that the two leases could not stand together. Reletting within those covenants is merely the administration of an abandoned estate. When it is done, the landlord should not be held to have accepted the abandonment merely because he does not notify the lessee that the reletting is for his benefit. Lessees must respond to a liability arising from the covenant of the lease. An act done to minimize that liability does not discharge the lessee from that covenant.

*Ralph, et al. v. Deiley, et al.*, 141 A. 640, 642-43 (Penn. 1928).

In an extensive discussion of the issue, and relying upon encyclopedic authority, the Court of Appeals of Wisconsin stated:

¶ 10 After a tenant has breached its lease and vacated the premises, a tenant's liability for the breach is evaluated in part by determining whether the landlord has accepted the tenant's return in a manner that effects a legal surrender of the premises. 51 C.J.S. *Landlord & Tenant* § 122 (1968). "Surrender" entails the tenant's giving up of the lease before its expiration and the landlord's acceptance of the tenant's relinquishment of rights, either in fact or as implied at law. 49 Am.Jur.2d *Landlord & Tenant* § 242 (1995).

¶ 11 Once the premises have been returned to the landlord before the expiration of the lease, a landlord may either: (1) accept the tenant's surrender and re-enter the premises to re-let them for the landlord's own account, thereby releasing the tenant from any further liability for rent, or (2) notify the tenant that it is re-entering and re-letting the premises for the tenant's benefit and therefore the monies received from the successor tenancy will be fully credited to the initial tenant's obligation under the lease. *See Kersten v. H.C. Prange Co.*, 186 Wis.2d 49, 53, 520 N.W.2d 99, 101 (Ct.App. 1994); *First Wis. Trust Co. v. L. Wiemann Co.*, 93 Wis.2d 258, 271, 286 N.W.2d 360, 366 (1980). [3] If the premises are re-rented for the initial

[3] The two alternatives available to the landlord are correctly paraphrased as they appear in 49 Am.Jur.2d *Landlord & Tenant* § 243. The second option as it relates to notifying the tenant is not supported by *Weinsklar Realty Co. v. Dooley*, 200 Wis. 412, 228 N.W. 515, 67 A.L.R. 875. The only other case cited to support the Am.Jur. text is *Centurion Development Ltd. v. Kenford Co.*, 400 N.Y. Supp.2d 263. Likewise, in the text of the opinion the authorities

(continued...)

tenant's account, that tenant remains responsible for the payments due on the underlying lease until its term has concluded. 49 Am.Jur.2d *Landlord & Tenant* § 243.

. . . .

¶ 13. In this case, we consider whether CCS North Henry took possession of the premises for the purposes of mitigating damages and thereby entered into a lease with Army Store for the account of Tully or whether it accepted surrender of the premises and rented to Army Store for its own account, because those are mutually exclusive choices. *See First Wis. Trust Co.*, 93 Wis.2d at 271, 286 N.W.2d at 366; Wis. Stat. § 704.29(4)(b). As the court stated in *First Wisconsin Trust*:

> The right to elect which course he will pursue remains with the landlord until he makes his election by taking some step which clearly evidences an intent to make a choice between the two inconsistent remedies that are open to him.

*First Wis. Trust*, 93 Wis.2d at 271, 286 N.W.2d at 366 (quoting *Weinsklar Realty Co. v. Dooley*, 200 Wis. 412, 415, 228 N.W. 515, 517 (1930). However, as the court instructs, the mere entry and taking possession of the premises does not necessarily constitute acceptance of surrender as a matter of law. That act is equivocal, as the landlord's obligation to mitigate damages by re-letting the premises could cause it to re-rent without the intent to accept the surrender of the premises, and it is the landlord who has the right to elect which remedy it will select.

*C.C.S. North Henry, LLC v. Tully*, 624 N.W.2d 847, 850; 851 (Wis.Ct.App. 2000).

In the *Tully* case the court reasoned that since the landlord had rented the property to the Army Store and then had refused to apply the rentals received therefrom in mitigation of the lessee's damages the landlord had as a matter of fact elected to re-let the premises in its own right thus discharging the lessee's liability for future rents.

As the Supreme Court of Kansas held in *Guy v. Gould*, the party who has breached the contract is the lessee, and in jurisdictions such as Tennessee and Kansas the landlord must make

---

[3] (...continued)

cited are not supportive of a requirement that the landlord notify the tenant that the reletting is for the purpose of mitigation. *Kersten v. H.C. Prange Co.*, 186 Wis.2d 49, 53, 520 N.W.2d 99, 101 (Ct.App. 1994) does not so state and the only other case cited, *First Wisconsin Trust Co. v. L. Weiman Co.*, 93 Wis.2d 258, 271, 286 N.W.2d 360, 366 (Wis. 1980), in fact states: "When a tenant vacates or abandons the lease premises before the end of the lease term, the landlord has a right to elect (1) to accept the surrender and terminate the lease or (2) to enter and take possession for the purpose of mitigating the damages for which the tenant is liable because of his breach of the lease." 286 N.W.2d 360, 366 (Wis. 1980). *Weinsklar Realty Co. v. Dooley* held that the bringing of the action to collect rent from the tenant provided the only notice to the tenant necessary and "constituted . . . such unequivocal act as would amount to an election of remedies in a proper case." 228 N.W. 515, 517 (Wis. 1930). *Centurian Development Ltd.* recognized New York cases limiting the *Gray v. Kaufman Dairy* Rule, particularly in cases where contractual provisions provided reletting options but reaffirmed the New York common law rule.

-16-

reasonable efforts to re-let the premises and thus mitigate the damages owing by the lessee. The election belongs to the lessor and "the tenant does not need to be told what his obligation is. He knows it is to pay rent to the end of the term, according to the covenant of the lease. Therefore reletting does not establish release of obligation to pay rent, and notice of reletting is not necessary to prevent surrender." *Guy v. Gould*, 266 P. 925 (Kan. 1928).

To accept, as *Maney* purports to do, the New York rule and presume that reletting after abandonment manifests an intention by the landlord to discharge the tenant from future rentals defies the progression of common law and contract provisions relative to reletting. In the case at bar the tenant, not the landlord, breached the lease contract and set in motion this chain of events leading to the consequences of his abandonment.

> Historically it has been a troublesome problem for landlords as to what course of action to pursue when a tenant has abandoned the premises before the end of the lease term. If the landlord simply stood aside and suffered the premises to remain vacant the lease relation continued, but if the landlord as a man of prudence attempted to utilize the premises by reletting them, he incurred the risk of terminating the landlord-tenant relationship and with it the liability of the tenant for the rent unless he was exceedingly careful. Under the prevailing rule in most jurisdictions, a landlord is under no obligation to attempt to relet the premises following an abandonment thereof by the tenant before the expiration of the lease. 49 Am.Jur.2d *Landlord and Tenant* § 621 (1970); Groll, *Landlord-Tenant: The Duty to Mitigate Damages, supra* at 312; Comment, *Landlord's Obligation to Mitigate When Tenant Abandons*, 1960 U.Ill.L.F.R.C. 1533.161 332; *see e.g. Patterson v. Emerick*, (1899) 21 Ind.App. 614, 52 N.E. 1012. *Aberdeen Coal & Mining Co. v. City of Evansville* (1896), 14 Ind.App. 621, 43 N.E. 316. In fact, a landlord who does more than sit idly by and collect rent may find he has acted to his detriment. As a result, although it is undesirable to simply permit premises to lie unproductively vacant, landlords have been reluctant to take steps to relet for fear their actions would terminate the tenant's liability.
>
> To avoid this result, lease provisions evolved expressly covering the situation where the tenant abandons the leased premises before the expiration of the term. Both parties found such provisions more advantageous than simply permitting the premises to lie vacant. The lessors preferred to relet since this meant they would no longer have to rely solely upon the continued solvency of the original tenant, and their losses would be reduced in the event of that lessee's insolvency or disappearance. *See* 2 R. Powell, The Law of Real Property ¶ 231[1] (P. Rohan ed. 1977). The tenant preferred to have the premises relet since its losses would also be reduced or obviated by such an action. Accordingly, the parties began expressly contracting to permit a landlord to relet the premises in the event of a forfeiture or abandonment by the tenant.
>
> It is now clear a lessor and lessee may expressly agree that a re-entry and reletting shall not constitute a surrender. 3A G. Thompson § 1345; McCormick, *The*

*Rights of the Landlord upon Abandonment of the Premises by the Tenant*, 23 Mich.L.Rev. 211 (1925). Since a lease, like other contracts, should be reasonably interpreted to effectuate the intention of the parties, when a lease expressly permits the landlord to relet, there is no reason why it should not be enforced, thereby recognizing the integrity of the landlord and the tenant to contract, Comment, *Landlord's Obligation to Mitigate When Tenant Abandons, supra*; consequently, these provisions have been uniformly upheld by the courts. 3A G. Thompson § 1343; Krieger & Shurn, *Landlord-Tenant Law: Indiana at the Crossroads*, 10 Ind.L.Rev. 591, 639 (1977).

> There is nothing illegal or improper in an agreement that the obligation of the tenant to pay all the rent to the end of the term shall remain, notwithstanding there has been a re-entry for default; and, if the parties choose to make such an agreement, we see no reason why it should not be held to be valid as against both the tenant and his sureties.

*Grommes v. St. Paul Trust Co.*, (1893) 147 Ill. 634, 35 N.E. 820, 822; *accord Yates v. Reid*, (1950) 36 Cal.2d 383, 224 P.2d 8; *Ruston v. Centennial Real Estate & Investment Co.*, (1968) 166 Colo. 377, 445 P.2d 64; *see also Waffle v. Ireland*, (1927) 86 Ind.App. 119, 155 N.E. 513. As long as the landlord does no more than exercise the rights accorded to it under the lease, the lessor's conduct will not result in a surrender of the lease by operation of law.

*Grueninger Travel, etc. v. Lake City Trust*, 413 N.E.2d 1034, 1041-1042 (Ind.Ct.App. 1980).

The *Grueninger* case involved a lease provision wherein the landlord, at his option, could relet the premises and reduce the tenant's obligation for future rent by the offset resulting or could terminate the lease. The court then observed:

> This court has previously held that when such a savings clause appears in a lease and the landlord endeavors to relet the premises, these reletting efforts will not constitute a surrender by operation of law, *Hirsch v. Merchants National Bank & Trust Company of Indiana*, (1975) 166 Ind.App. 497, 336 N.E.2d 833; *Carpenter v. Wisniewski*, (1966) 139 Ind.App. 325, 215 N.E.2d 882, since it would be inconsistent to ask landlords to act diligently to mitigate damages and then, in effect, penalize them for so acting by finding their steps toward mitigating evidenced an acceptance. Today we decline to limit the permissible bounds within which the landlord can act to only efforts to relet. If the lease expressly provides, as the agreement herein did, that the landlord may relet without terminating the original lessee's liability, then we see no reason to hold a surrender and acceptance have been effectuated as a matter of law simply because the landlord relets the premises. *See* Groll, *Landlord-Tenant: The Duty to Mitigate Damages, supra* at 316; Krieger & Shurn, *Landlord-Tenant Law: Indiana at the Crossroads, supra* at 638; *cf. Waffle v. Ireland, supra*. Before we will imply an acceptance by the landlord, the landlord's actions must be

equivalent to an agreement to accept the proffered surrender. *Carp & Co. v. Meyer*, (1929) 89 Ind.App. 490, 167 N.E. 151. Where as here, the landlord acts pursuant to the lease agreement, its actions are consistent with the subsisting landlord-tenant relationship and therefore will not discharge the original tenant.

*Grueninger Travel, etc. v. Lake City Trust*, 413 N.E.2d 1034, 1043 (Ind.Ct.App. 1980).

Finally, the *Maney* case seems to be inconsistent with *Quarles v. Shoemaker*, 978 S.W.2d 551 (Tenn.Ct.App. 1998) (*perm.app.denied*). In that case the tenant abandoned the leased premises and landlord sought to recover rentals for the unexpired term of the lease.

Bennett took steps to re-lease the property, but it essentially remained vacant from February, 1996 through January, 1997.

. . . .

At no time did Quarles consent to a surrender of the premises and waive his right to collect rent for the remaining term of the lease, and his actions in securing the property may fairly be construed as an effort on his part to secure the unoccupied premises and mitigate damages upon Shoemakers' breach and abandonment of the lease.

978 S.W.2d 551, 552, 554 (Tenn.Ct.App. 1998).

Nothing in the proof in this case provides factual support for finding an intent by Bilbrey to accept Worley's abandonment of the premises as a surrender in law. While the Worleys were still in possession of the premises he forwarded his letter of November 25, 1996 extending the lease contract for ten years. The Worleys acknowledged in their testimony that at the time they determined to abandon the premises Bilbrey had already made his intentions known to them, and no other evidence appears in the record that would show any intention by Bilbrey at any time to do other than hold the Worleys to the lease agreement.

While the course taken by the lessor in this case is harsh and costly to the lessee, it is a business decision clearly authorized by the unambiguous provisions of the lease agreement. Believing that *Karns* does not mandate the holding in *Maney* relative to the necessity of notice to the defaulting party prior to reletting the premises, we decline to follow *Maney*, reverse the final judgment of the chancellor on this issue, and reinstate his initial judgment of January 25, 2002, with judgment to be entered in favor of Agnes Bilbrey's Estate and Bilbrey Family Limited Partnership in the amounts set forth in the chancellor's judgment of January 25, 2002.

The case is remanded to the trial court for such further proceedings as may be necessary. Costs of the cause are assessed to the appellees.

_____
WILLIAM B. CAIN, JUDGE